## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

**CAROL MAE ROLAND,**

                **Plaintiff,**

    vs.

**CAROLYN W. COLVIN,**
**Acting Commissioner of the**
**Social Security Administration;**

             **Defendant.**

**CASE NO.  4:13CV3085**

**MEMORANDUM
AND ORDER**

Carol Mae Roland filed a complaint on April 19, 2013, against the Commissioner of the Social Security Administration.  (ECF No. 1.)  Roland seeks a review of the Commissioner's decision to deny her application for disability insurance benefits under Title II and Title XVI of the Social Security Act (the Act), 42 U.S.C. §§ 401 et seq., 1381 et seq. The defendant has responded to Roland's complaint by filing an answer and a transcript of the administrative record.  (*See* ECF Nos. 9, 10).  In addition, pursuant to the order of Senior Judge Warren K. Urbom, dated June 25, 2013, (ECF No. 12), each of the parties has submitted briefs in support of her position.  (*See generally* Pl.'s Br., ECF No. 13; Def.'s Br., ECF No. 20, Pl.'s Reply Br., ECF No. 21). After carefully reviewing these materials, the Court finds that the Commissioner's decision must be affirmed.

## I.    BACKGROUND

Roland applied for disability insurance benefits and supplemental security income on May 20, 2010. (*See* ECF No. 10, Transcript of Social Security Proceedings (hereinafter "Tr.") 62-63, 129-32, 136-39). Roland alleged she had affective and mood

disorders and an onset date of April 3, 2010. (Tr. 62, 65, 129). After her application was denied initially and on reconsideration, (tr. 68-71, 76-79) Roland requested a hearing before an administrative law judge (hereinafter "ALJ").   (Tr. 80-81). This hearing was conducted on February 22, 2012. (Tr. 38-61). In a decision dated March 19, 2012, the ALJ concluded that Roland was not entitled to disability insurance benefits. (Tr. 17-36). The Appeals Council of the Social Security Administration denied Roland's request for review on March 28, 2013. (Tr. 1-5.) Thus, the ALJ's decision stands as the final decision of the Commissioner, and it is from this decision that Roland seeks judicial review.

## II.   SUMMARY OF THE RECORD

Roland was born on May 21, 1957. (Tr. 62). She has an associate's degree in liberal arts and paralegal training from Lincoln School of Commerce. (Tr. 164). Roland has work experience as a retail store clerk, a drug store price verifier, and a grocery store sacker. She was an instructor of English as a second language at Southeast Community College from 2000 to May 2010, when she had what she termed a nervous breakdown.[1] (Tr. 44, 164).

### A. Medical Evidence

Roland asserts that the medical issues related to her request for disability benefits began on April 4, 2010, when she was stopped by police for erratic driving and suspected of driving while intoxicated. (Tr. 247). She was taken to the emergency room of BryanLGH Medical Center West, where Kenton R. Sullivan, M.D., examined her.

Sullivan stated that he could understand the reason the police officers thought Roland was confused, but he believed she was displaying her normal demeanor and personality. Roland stated that she sometimes felt she could not think clearly. The physical exam showed that she was awake and alert, "just generally a little eccentric." (Tr. 247). She was discharged in improved condition and asked to follow up with a physician as soon as possible. (Tr. 250).

Accompanied by her daughter, Roland returned to BryanLGH on May 3, 2010, complaining of a headache. (Tr. 239). Her daughter reported that Roland had been crying, upset, tremulous, anxious, and jumpy, apparently because of the headache pain. She also had difficulty sleeping. Roland did not report any depression. (Tr. 239). She was referred to mental health nurses for evaluation. (Tr. 240).

One week later, on May 10, 2010, Roland was seen at the People's Health Center for confusion, poor appetite, and panic. (Tr. 257). Kim Joy, APRN, noted that Roland had not been seen at the clinic for two years, but she appeared noticeably different and was less talkative. She was assessed as having anxiety and panic disorder. (Tr. 258).

Roland was admitted to BryanLGH on May 11, 2010. (Tr. 327). She presented with worsening anxiety, poor memory, and thought disorganization and was diagnosed with major depressive disorder, single episode with psychotic features. On admission

---

[1] Although the ALJ made findings related to alleged physical impairments, Roland has not disputed those findings and only the alleged mental impairments are at issue here.

her GAF was 35, and when she was discharged on May 16, 2010, her GAF was 55.[2] With medication, she improved, her mood became brighter, and she was more talkative. She agreed to go to the partial hospitalization program at the Community Mental Health Center of Lancaster County (CMHC). Upon discharge from BryanLGH, Roland was calm, cooperative, and happy. (Tr. 327).

Upon admission to the partial hospitalization program at CMHC on May 17, 2010, Roland was diagnosed with mood disorder and cognitive disorder. Her GAF was 34.[3] (Tr. 423). She appeared to be disorganized and impaired in day-to-day functioning. (Tr. 424). It was recommended that she be admitted to the program full time for an estimated two weeks. (Tr. 424). A history and physical evaluation on May 18, 2010, resulted in a diagnosis of brief reactive psychosis; adjustment disorder with mixed emotional features; major depression, severe, recurrent without psychotic feature; and R/O cognitive disorder, not otherwise specified. Her GAF was 40. (Tr. 429).

Notes from the People's Health Center on June 1, 2010, indicate that Roland was doing much better on her current medications. (Tr. 255). She was dismissed from the partial hospitalization program on June 4, 2010, with the diagnosis of major depressive disorder, moderate. (Tr. 426). Her GAF was 48. Roland reported improvement in most of her symptoms, although she still had some mild depression and

---

[2] "The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning 'on a hypothetical continuum of mental-health illness.'" *Pate-Fires v. Astrue*, 564 F.3d 935, 937 n. 1 (8th Cir. 2009) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994)).

[3] Records of some of Roland's treatment at CMHC between June 7, 2010, and May 23, 2012, were submitted to the Appeals Council after the ALJ's order was entered.

mild anxiety symptoms. She demonstrated improved ability to cope. At dismissal, she appeared to track better and had a brighter affect. (Tr. 426).

Roland had an initial psychiatric diagnostic interview with Gary Nadala, M.D., at the CMHC on June 18, 2010. (Tr. 262). Roland said medication had helped since her visit to the emergency room and she wanted to continue taking it, but she said they were expensive. Nadala said she showed some delay in her responses, mild psychomotor retardation, anxious mood, fair memory, fair insight and judgment, and impulse control. She was diagnosed as having anxiety disorder, post traumatic stress disorder (PTSD), and dysthymic disorder. Her GAF was 49. (Tr. 262). Nadala recommended that Roland continue her medications and continue with outpatient partial hospitalization. (Tr. 263).

On October 29, 2010, Patricia Bohart, M.D., conducted an initial psychiatric diagnostic interview at the CMHC after Roland was transferred for psychiatric care from Nadala. (Tr. 300). Roland reported that she was greatly improved and that the medications she had been taking for five months were very helpful and had stabilized her moods considerably. Her anxiety level was under control. (Tr. 300). Dr. Bohart reported that Roland's mood was euthymic and her affect was mood-congruent. Her thoughts were logical and goal directed. (Tr. 301). She was diagnosed as having major depressive disorder, single episode, with psychotic features partially resolved. Her GAF was 50. (Tr. 301).

Roland attended group therapy sessions at the CMHC between June 9, 2010, and January 25, 2012. (Tr. 357-413). At the initial session in June 2010, Roland had a neutral affect and flat intensity. She was cooperative and attentive and participated well

5

in open discussion. By the second session her affect was normal and her mood was euthymic. (Tr. 391). Through the first two months, she readily participated and engaged in the group discussions. (Tr. 382-90). Her mood continued to be euthymic and her affect was normal. (Tr. 379, 371). For two weeks in October 2010, her affect appeared blunted and her mood mildly dysphoric. (Tr. 365). By November 2010, she was pleasant and shared her plans for Thanksgiving with the group. (Tr. 363). At the end of December 2010, Roland was pleasant during group discussions, offered constructive feedback, and was attentive to peers. (Tr. 358).

In January 2011, Roland reported that she had decreased her medication and was having some low-level anxiety. However, her affect was within the appropriate range and she appeared to benefit from the group. (Tr. 412). By the end of February 2011, she reported that she was doing well. (Tr. 411). In April 2011, Roland reported that she was frustrated she was not where she wanted to be in her recovery from her "breakdown" a year earlier. (Tr. 407). In June 2011, Roland reported being more depressed and her mood appeared mildly dysphoric. (Tr. 402). By September 2011, her mood was cheerful. (Tr. 397), and in November 2011, her affect showed appropriate range. (Tr. 395). In January 2012, Roland expressed frustration waiting for her disability hearing. (Tr. 393). Throughout group therapy, Roland was an active participant and provided support to peers. (Tr. 393).

Roland also took part in individual therapy with Dr. Bohart between December 2010 and January 2012. Initially, Dr. Bohart reported that Roland was doing all right with an adjustment in her medication, although she reported that she had a little more anxiety and her depression had increased slightly. (Tr. 444). In February 2011, Dr.

6

Bohart reported that Roland was coming out of a depression over the anniversary of her mother's death, but she was doing better, sleeping better, and getting along okay. (Tr. 443). Roland's moods were fairly even in April 2011. (Tr. 442). In May 2011, Dr. Bohart reported that Roland's moods were satisfactory, but she had noticed some increased anxiety since cutting back on cigarettes. (Tr. 441). Dr. Bohart adjusted Roland's medications in July 2011, reporting that Roland had a slight relapse of her depressive symptoms and things were not going as she had expected. (Tr. 440). By August 2011, Dr. Bohart reported that Roland's moods had improved and her affect was brighter. (Tr. 439). Overall she seemed to really enjoy life, and she volunteered one day each week at the Matt Talbot Kitchen. (Tr. 439). Roland's prognosis was fair to good in November 2011, and she had made fair progress by increased recognition of distorted/negative self-talk and its effect on her emotional responses. (Tr. 422).

On February 7, 2011, Joy at the Peoples Health Center stated that Roland was not capable of any substantial gainful employment due to the severity of her symptoms related to depression and anxiety. (Tr. 326). Joy opined that Roland was permanently disabled. (Tr. 325).

Progress notes from counseling sessions at CMHC in 2012 showed that in January, Roland's mood was dysphoric mixed with apprehension. (Tr. 420). She expressed uncertainty about failing to agree to help with her grandchildren but also resented it when she passively agreed to help with them. (Tr. 420). She continued to exhibit gradual improvements in the use of cognitive/behavioral strategies for coping with daily stressors and anxiety. (Tr. 421).

In March 28, 2012, Roland reported feeling angry about the denial of her disability. (Tr. 452). She did not think the reasons for the denial were an accurate reflection of her level of functioning, medical diagnoses, or current situation. She had good support through friends and treatment groups and planned to call on them to help her through the difficult time. (Tr. 452).

In a recovery plan and yearly review dated April 3, 2012, Roland was diagnosed with major depressive disorder, single episode with psychotic features partially resolved. Her GAF was 44. (Tr. 430). It noted that Roland's symptoms of anxiety and depression impaired her ability to follow through with activities of daily living, community participation, and socialization. She could benefit from community support services in order to re-establish adult daily living skills to improve her ability to function in the community and to maximum her stability and independence. (Tr. 430). The report indicated that Roland had a severe and persistent mental illness which required continued treatment for stability. A review was scheduled for one year. (Tr. 432).

Dr. Bohart noted on April 16, 2012, that Roland was frustrated because she was denied disability. (Tr. 435). She reported having a horrible time functioning and her social skills were quite impaired. Dr. Bohart reported concerns that Roland was starting to regress. (Tr. 435).

Roland continued counseling at the CMHC in May 2012, when she presented with dysphoria and apprehension. (Tr. 414). The clinician noted that Roland's emotional responses were appropriate considering the circumstances, which included the two-year anniversary of Roland's breakdown and the death of her best friend. (Tr. 415). Roland expressed anger and frustration with the process of applying for disability. (Tr.

8

416). Roland continued to report gradual increased participation in leisure and social activities, and proper management of her accompanying anxiety. (Tr. 417).

### B. Medical Opinion Evidence

Robert G. Arias, M.D., completed a psychological report on September 21, 2010. (Tr.267). Roland reported that she had a psychotic depression in May 2010 and was hospitalized for one week. (Tr. 268). She was prescribed Zyprexa and Celexa and her mood had improved since then. She was occasionally having thoughts that someone might harm her, but she denied that the thoughts interfered with her daily activities. She had monthly flashbacks to childhood sexual abuse. Roland said she had not returned to work since her breakdown because she was afraid to enter the classroom. She also stated that she had no desire to return to work. She reported problems with concentration that resulted in difficulty putting together plans or completing tasks. However, she stated that she was eventually able to complete the tasks. (Tr. 268). Her typical day involved going to group therapy twice per week and volunteering once a week at Matt Talbot Kitchen. She denied any difficulty with accomplishing activities of daily living. She helped her daughter care for her grandchild.  Roland said she had two close friends and several other friends. (Tr. 269).

Dr. Arias reported that Roland demonstrated intact ability to receive, organize, analyze, remember, and express information appropriately. Her mood was euthymic and her affect was stable and appropriate. There was no lack of contact with reality and there were no observable signs of tension, anxiety, psychomotor disturbance, or substance abuse. Her judgment and insight were reasonable. (Tr. 269). Dr. Arias found no restriction in the activities of daily living or maintenance of social functioning. There

had not been recurrent episodes of deterioration when stressed resulting in withdrawal from situations and exacerbation of symptoms. (Tr. 269). Roland had a single episode of major depression in May 2010, but she appeared to maintain adequate ability to sustain concentration and attention needed for simple task completion, and she was able to understand and remember short and simple instructions and carry them out under ordinary supervision. She appeared capable of relating appropriately to coworkers and supervisors as well as adapting to basic changes in her environment. Dr. Arias diagnosed Roland as having major depressive episode, single episode, unspecified; and features of PTSD. Her GAF was 65-70. (Tr. 270). Dr. Arias said Roland was able to sustain concentration and attention needed for task completion, to understand and remember short and simple instructions under ordinary supervision, to relate appropriately to coworkers and supervisors, and to adapt to changes in her environment. (Tr. 265).

Dr. Arias said Roland's prognosis was optimistic. Although she had longstanding limited symptoms of PTSD, those had not interfered in her daily activities to any significant degree. She thus had a good prognosis presuming stable daily functioning. Her episode of major depression appeared to have resolved to a great extent. She would likely continue to benefit from psychological and psychiatric treatment. (Tr. 270). She appeared capable of managing her benefits if awarded. (Tr. 271).

Lee Branham, Ph.D., completed a mental residual functional capacity (RFC) assessment on October 25, 2010. (Tr. 273-77). He determined that Roland was not significantly limited in the ability to remember locations and work-like procedures; to understand, remember, and carry out very short and simple instructions; to perform

10

activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to make simple work-related decisions; to complete a normal workday and workweek without interruptions and to perform at a consistent pace without an unreasonable number and length of rest periods; to ask simple questions or request assistance; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; to respond appropriately to changes in the work setting; to be aware of normal hazards and take appropriate precautions; to travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others. (Tr. 273-74). Roland had moderate limitations in the ability to understand, remember, and carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or proximity to others without being distracted by them; and to interact appropriately with the general public. (Tr. 273-74).

Branham stated that Roland continued to report some difficulty with attention/concentration and difficulty returning to her teaching job, so she appeared to have moderate limitations in handling a full range of detailed work. (Tr. 275). She would have moderate limitations in carrying out detailed instructions, but could carry out simple ones under ordinary supervision. Her limitations in attention/concentration were moderate and she had moderate limitations in avoiding distraction by others. Her social anxiety led to moderate limitations in dealing with the public. (Tr. 275).

On a psychiatric review technique, Branham indicated that Roland had major depression with history of psychotic features, (Tr. 281) anxiety disorder NOS, and PTSD. (Tr. 283). Branham indicated that Roland had mild restriction of activities of daily living, and moderate difficulties in maintaining social functioning, concentration, persistence, and pace. (Tr. 288). She had one or two repeated episodes of decompensation. (Tr. 288). He stated that objective findings did not point to a level of anxiety or depression that would prevent her from doing less demanding work. (Tr. 290). On January 13, 2011, Christopher Milne, Ph.D., affirmed the mental RFC of October 25, 2010. (Tr. 323)

On a psychiatric review technique dated February 21, 2012, Dr. Bohart indicated that Roland had an affective disorder. (Tr. 343). Her disturbance of mood reflected a depressive syndrome characterized by aphedonia or pervasive loss of interest in almost all activities, sleep disturbance, feelings of guilt or worthlessness, difficulty concentrating or thinking, and thoughts of suicide. (Tr. 346). Dr. Bohart said that Roland had moderate restrictions in activities of daily living and maintaining social functioning, and marked difficulties in maintaining concentration, persistence, or pace. She had three episodes of decompensation. (Tr. 353). Dr. Bohart indicated that Roland had a medically documented history of a chronic affective disorder of at least two years' duration that had resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would cause her to decompensate. (Tr. 354).

### C. Hearing Testimony

At a hearing on February 22, 2012, Roland stated that she lived in her daughter's home with her daughter and son-in-law, their two children, and Roland's son.

12

(Tr. 44). She stopped working as an instructor of English as a second language for Southeast Community College (Tr. 44) in May 2010 when she had a nervous breakdown. (Tr. 20). She had not worked since that time. (Tr. 44).

Roland explained that about one month before the nervous breakdown, she became nervous and paranoid, could not concentrate, was distracted, and thought someone was going to hurt her or her students. (Tr. 46). She said medication had helped but she still had those feelings. Roland said it is difficult for her to go out in public. (Tr. 47). She cannot take public transportation because there are too many people who are too close. (Tr. 48). She lost her driver's license shortly before the nervous breakdown when she was ticketed for erratic driving. She said she cannot read because she gets distracted and cannot keep the characters straight. If she tried to read a text a second time, she had forgotten what she previously read. (Tr. 48). Roland said she spent most of her time by herself, watching television, pacing the floor, or playing with her grandchildren. (Tr. 49).

Roland said she got paranoid and felt something bad was going to happen when she was in public or around people. (Tr. 50). She did not go to malls or to church because there were too many people. (Tr. 50). She said she could no longer write a paragraph because she could not concentrate. (Tr. 51). Roland said she had difficulty making decisions and her daughter had to help her pick out her clothes. (Tr. 52).

Dale Lanhart, a vocational expert (VE), (Tr. 53), stated that, based on her testimony, Roland would not be able to return to her past work because she has difficulty concentrating and has panic and anxiety attacks. (Tr. 55). If she were able to maintain concentration and attention span for 90 percent of the time and have 90

13

percent contact with the public and co-workers, she would be able to return to past work. (Tr. 55). The VE stated that a hypothetical worker who could perform simple tasks requiring one, two, or three steps, but not detailed work, would not be able to return to any of Roland's past work. (Tr. 56).

The ALJ asked Lanhart whether there was any work in the national or regional economy that a hypothetical worker would be able to do if the worker were the same age as Roland, had the same educational background of high school plus four years of postsecondary education, and were able to perform skilled work with the same transferable skills as Roland, including no exertional physical limitation, mental limitations limited to one, two, or three steps, maintaining attention span and concentration 90 percent of the time, and having contact with the public or co-workers 90 percent of the time. (Tr. 56). The VE identified several unskilled jobs that such an individual would be able to handle. The first was production assembler, in which the employee was virtually isolated and there was rare contact with a supervisor. (Tr. 57). There were 1,928 production assembler jobs in the region and 40,998 jobs in the country. (Tr. 56). A second job that the hypothetical worker could do is hand packager, of which there were 14,148 jobs at the light level in the region and 311,534 in the country. At the medium level, there were 7,319 jobs in the region and 161,138 in the country. (Tr. 57). The VE also found that there were unskilled cashier positions that would meet this hypothetical. In the region there were 34,856 jobs at the light unskilled job level and 1,103,014 jobs in the country. (Tr. 57). Another job that would be more isolated than cashier was housekeeping cleaner, which was a light, unskilled job, of which there were 16,638 in the region and 366,755 in the country. (Tr. 57-58). At the

14

medium level, there were 15,900 housekeeping jobs in the region and 350,000 in the country. (Tr. 58).

The VE stated that there would not be any available work if the same worker was unable to sustain an ordinary routine without special supervision 25 percent of the time and the concentration level was reduced to 75 percent. (Tr. 58). An individual with marked difficulties and limitations in maintaining concentration, persistence, and pace would not be able to perform the jobs identified. (Tr. 59). An individual with moderate difficulties maintaining social functioning would be able to perform the four jobs. An individual who had moderate restrictions of daily living, moderate difficulties maintaining social functioning, marked difficulties maintaining concentration, persistence, and pace, and three episodes of decompensation during the year would not be able to do any of the jobs identified. (Tr. 59).

### D. The ALJ's Decision

An ALJ is required to follow a five-step sequential analysis to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520(a). The ALJ must continue the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be disabled at step three or step five. *See id.* In this case, the ALJ found that Roland is not disabled. (Tr. 17-32).

Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity. *See* 20 C.F.R. § 404.1520(a)(4)(i), (b). If the claimant is engaged in substantial gainful activity, the ALJ will find that the claimant is not disabled. *See id.* The ALJ found that Roland had not engaged in substantial gainful activity since April 3, 2010, the alleged onset date. (Tr. 19).

15

Step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. § 404.1520(c).  A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to do "basic work activities" and satisfies the "duration requirement."  *See* 20 C.F.R. § 404.1520(a)(4)(ii), (c); *id.* § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months.").  Basic work activities include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b).  If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled.  *See* 20 C.F.R. § 404.1520(a)(4)(ii), (c). The ALJ found that Roland had the following severe impairments: major depressive disorder with history of psychotic features, resolved; PTSD; and history of anxiety disorder, not otherwise specified. (Tr. 19). The ALJ also found that Roland's medically determinable mental impairments resulted in mild limitations in activities of daily living, mild limitations in maintaining social functioning, and moderate limitations in maintaining concentration, persistence, or pace, and that she had no repeated episodes of decompensation. (Tr. 19). The ALJ also noted that there was evidence Roland had or had a history of fibromyalgia; breast cancer with right mastectomy in 1993; history of hypertension requiring medication for control; history of arthritis requiring ibuprofen in the past; history of a partial thyroidectomy without cancer in 1997; history of elevated

16

glucose levels without an accompanying diagnosis; and history of asthma in the context of cigarette smoking. The ALJ found that those conditions were not severe impairments, either singly or in combination, and they were not, either singly or in combination, more than slight abnormalities that had more than a minimal effect on her ability to perform basic work activities. (Tr. 20).

Step three requires the ALJ to compare the claimant's impairment or impairments to a list of impairments.  *See* 20 C.F.R. § 404.1520(a)(4)(iii), (d); *see also* 20 C.F.R. Part 404, Subpart P, App'x 1.  If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be disabled.  *See* 20 C.F.R. § 404.1520(a)(4)(iii), (d).  If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five.  *See* 20 C.F.R. § 404.1520(a).  The ALJ found that Roland did not have an impairment or combination of impairments that met or medically equaled the severity of  one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). (Tr. 20).

Step four requires the ALJ to consider the claimant's RFC[4] to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work." *See* 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f).  If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled.  *See* 20 C.F.R. §

---

[4]   The assessment of a claimant's residual functional capacity measures the highest level of physical and mental activity the claimant can perform despite his or her limitations. *See* 20 C.F.R. § 404.1545 and 20 C.F.R. § 416.945. *See* also *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)) (residual functional capacity is what the claimant is able to do despite limitations caused by all of the claimant's impairments.).

404.1520(a)(4)(iv), (f). In this case, the ALJ found that Roland had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: Roland could perform only tasks of one, two, or three steps; she could maintain attention span and concentration for 90 percent of the time; and she could maintain 90 percent contact with the public and co-workers. (Tr. 20).

The ALJ found that Roland's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (Tr. 21). However, the ALJ found that Roland's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent they were inconsistent with the RFC. (Tr. 21). The ALJ found that Roland was unable to perform any past relevant work. (Tr. 30).

Step five requires the ALJ to consider the claimant's RFC, age, education, and past work experience to determine whether the claimant can do work other than that which he or she has done in the past. *See* 20 C.F.R. § 404.1520(a)(4)(v), (g); id. § 416.920(a)(4)(v), (g). If the ALJ determines that the claimant cannot do such work, the claimant will be found to be "disabled" at step five. *See* 20 C.F.R. § 404.1520(A0(4)(v), (g); id. § 416.920(a)(4)(v), (g). Here, the ALJ determined that, considering Roland's age, education, work experience, and RFC, Roland was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. (Tr. 31). Roland had not been under a disability from April 3, 2010, through the date of the decision. (Tr. 31).

### III.  STANDARD OF REVIEW

I must review the Commissioner's decision to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings." *Johnson v. Chater*, 108 F.3d 178, 179 (8th Cir. 1997) (quoting *Clark v. Chater*, 75 F.3d 414, 416 (8th Cir. 1996)).  *See also Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011). "Substantial evidence is less than a preponderance but enough that a reasonable mind might accept as adequate to support the conclusion." *Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013) (internal citations omitted).  A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010).  Nevertheless, the court's review "is more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp' of the Commissioner's action." *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008) (citations, brackets, and internal quotation marks omitted).  *See also Moore v. Astrue*, 623 F.3d 599, 602 (8th Cir. 2010) ("Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision.").

I must also determine whether the Commissioner's decision "is based on legal error." *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (quoting *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)).  "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." *Id.* (citations omitted). No deference is owed to the Commissioner's legal conclusions.  *See Brueggemann v.*

19

*Barnhart*, 348 F.3d 689, 692 (8th Cir. 2003).   *See also Collins*, 648 F.3d at 871 (indicating that the question of whether the ALJ's decision is based on legal error is reviewed de novo).

## IV.   ANALYSIS

In a disability benefits case, the claimant has the burden to prove that he or she has a disability. *Teague v. Astrue*, 638 F.3d 611, 615 (8th Cir. 2011). Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). The claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); *see* also *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

The ALJ determined that Roland had not met her burden to prove that she is disabled and that she could not engage in gainful employment. Roland asserts that the ALJ erred in several respects by 1) failing to properly consider Roland's concentration issues; 2) using a legally defective standard at step five of the disability determination; 3) improperly assigning weight to the medical source opinions; and 4) failing to properly assess her credibility. The Court concludes that the ALJ did not err and that there is substantial evidence in the record to support the ALJ's decision.

20

*Concentration Issues*

The ALJ found that Roland was able to maintain attention span and concentration for 90 percent of the time and that Roland's severe mental impairments did not result in at least two of the following: marked restrictions in activities of daily living; or marked difficulties in maintaining social functioning; or marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation. (Tr. 20).

In considering Roland's symptoms, the ALJ followed a two-step process in which he first determined whether there was an underlying medically determinable physical or mental impairment, such as an impairment that can be shown by medically acceptable clinical and laboratory diagnostic techniques, that could reasonably be expected to produce her pain or other symptoms. Second, the ALJ evaluated the intensity, persistence, and limiting effects of Roland's symptoms to determine the extent to which they limit her functioning. (Tr. 21).

The ALJ noted that Roland's alleged significant problems with concentration and memory were not exhibited at the hearing. (Tr. 29). Roland was able to respond appropriately to questions, to provide lengthy and detailed explanations, and to testify for an extended period of time. The ALJ stated that Roland did not frequently ask to have things repeated and did not require frequent repetition of questions or rephrasing of questions with simple words and short sentences. "Indeed, the claimant was able to provide multiple points of information and reasons when responding to questions." (Tr. 29). Roland's testimony was not "significantly hindered or overshadowed by anxiety or

21

depression or by loss of concentration or loss of attention or by signs of severe credible pain." (Tr. 29).

Roland argues that there is substantial evidence in the record of her problems with concentration. At the hearing, she testified that she could not concentrate in the month leading to her nervous breakdown. (Tr. 46). She said she was stopped for erratic driving because it was hard to pay attention. (Tr. 48). She testified that she repeats questions in a conversation because she is distracted and she cannot read because she has to re-read the same pages. (Tr. 48). She asserts that she had to stand up at the hearing after 14 minutes of questioning. (Tr. 49). She claims she was only questioned for 20 minutes, which does not demonstrate her ability to concentrate during a full workday. (Tr. 49).

The ALJ observed Roland's behavior at the hearing and determined that it did not support her claims of an inability to concentrate. "The ALJ's personal observations of the claimant's demeanor during the hearing is completely proper in making credibility determinations." *Johnson v. Apfel*, 240 F.3d 1145, 1147-48 (8th Cir. 2001). The ALJ concluded that Roland exhibited appropriate behavior during the hearing, and the Court finds no error in this determination.

Roland also argues that other evidence in the record supports her claim that she has difficulty with concentration. She cites her activities of daily living report, in which she stated that she has trouble making decisions and is easily distracted. (Tr. 183). Dr. Bohart stated in a psychiatric review technique, dated February 21, 2012, that Roland had difficulty concentrating or thinking and marked difficulties in maintaining concentration, persistence, or pace. (Tr. 346, 353).

22

However, the ALJ did not give controlling weight to Dr. Bohart's opinion in the psychiatric review technique. (Tr. 27). The ALJ noted that there was only one treatment note by Dr. Bohart, dated October 29, 2010, and it lacked strong objective findings to support the opinion and her opinions and conclusions were contradicted by other evidence in the record. (Tr. 27).[5] The psychiatric review technique form was prepared in support of Roland's request for disability.  If Roland had the severe limitations as reflected in Dr. Bohart's opinion, they would have been supported by actual treatment notes and consistent with other medical evidence, and the ALJ found that was not the case. (Tr. 27). This Court agrees.

The ALJ stated that Dr. Bohart's opinion relied heavily on Roland's reported history of past abuse, but Roland had performed substantial gainful activity for a number of years following the abuse. (Tr. 27). The ALJ found no evidence that Dr. Bohart used or followed a medically acceptable standardized methodology to determine Roland's alleged limitations. (Tr. 28). And there was no evidence that Dr. Bohart had received specialized training in the vocational evaluation of mental disability, such as the state agency medical consultants, who routinely use the psychiatric review technique form. The ALJ stated that Dr. Bohart did not clearly define her ratings so they could be understood. There was no evidence elsewhere in the record of the three episodes of decompensation, each of extended duration, that Dr. Bohart identified on the form. The

---

[5] Additional treatment notes were submitted to the Appeals Council. (Tr. 1-6). The Council did not find that the evidence required remand to the ALJ. This Court agrees with the Council and does not find that the additional evidence requires that more weight be given to Dr. Bohart's opinion.

ALJ noted that Dr. Bohart had used a check-off form to arrive at essentially conclusory statements that Roland was disabled. (Tr. 28).

The weight given to medical opinions is governed by 20 C.F.R. § 404.1527(c), which provides that factors, such as the examining relationship and the treatment relationship, including its length, nature, and extent, will be taken into consideration. In addition, "[g]enerally, the more consistent an opinion is with the record as a whole, the more weight" will be given to the opinion. 20 C.F.R. § 404.1527(c)(4). If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight. *Travis v. Astrue*, 477 F.3d 1037 (8th Cir. 2007). The issue of the weight given to medical source opinions in this case will be discussed further below, but the Court finds no error in the ALJ's consideration of Roland's alleged difficulties in concentration.

*Legally Defective Standard*

Roland next argues that the standard applied by the ALJ imposed too high a burden of proof on her and requires reversal. (Pl.'s Brf at 8). The ALJ stated that, at the last step of the sequential evaluation process, he "must determine whether the claimant is able to do any other work considering her residual functional capacity, age, education, and work experience. If the claimant is able to do other work, she is not disabled. If the claimant is not able to do other work and meets the duration requirement, she is disabled." (Tr. 19).

Roland cites to 42 U.S.C. § 423(d)(2)(A), which provides that "[a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but

24

cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ."

The ALJ stated that although a claimant generally continues to have the burden of proving disability at step five, the Social Security Administration carries a limited burden to provide evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the RFC, age, education, and work experience. (Tr. 19).

As noted earlier, a claimant's RFC measures the highest level of physical and mental activity he or she can perform despite his or her limitations. *See* 20 C.F.R. § 404.1545 and 20 C.F.R. § 416.945. *See* also *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)) (RFC is what the claimant is able to do despite limitations caused by all of the claimant's impairments.).

Roland cites *Ingram v. Chater*, 107 F.3d 598, 604 (8th Cir. 1997), in which the court stated: "Residual functional capacity 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" However, in that case the court was referring to the ALJ's findings as to whether the claimant could return to past work. In the case at bar, the ALJ determined that Roland cannot return to her past employment as an instructor, but he found that she can obtain other employment, and is therefore, not disabled. The Court finds that the ALJ did not improperly impose a greater burden on Roland.

*Weight of Medical Source Opinions*

Roland asserts that the ALJ did not give controlling weight to the opinions of medical sources, both treating and non-treating. (Pl.'s Brf at 8). As noted above, the ALJ did not give controlling weight to the opinion of Dr. Bohart because it was supported by only one treatment note. Pursuant to 20 C.F.R. § 404.1502, a treating source is the claimant's own physician who provides the claimant with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with the claimant.

The records, including those submitted to the Appeals Council, show that Roland took part in individual therapy with Dr. Bohart between December 2010 and January 2012. Dr. Bohart noted improvement in Roland's moods over time. By August 2011, Roland's affect was brighter, she was enjoying life, and volunteering. (Tr. 439). Thus, Dr. Bohart's treatment records do not support her conclusions. The inconsistencies support the ALJ's decision to give less weight to Dr. Bohart's opinion. (An ALJ may discount treatment notes that are inconsistent with an RFC form. *Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005)).

Dr. Bohart's psychiatric review technique, dated February 21, 2012, was a checklist on which she indicated that Roland had moderate restrictions in activities of daily living and maintaining social functioning, and marked difficulties in maintaining concentration, persistence, or pace. (Tr. 353). A treating physician's "Medical Source Statement," which consisted of a series of check marks assessing RFC, may be discounted as a conclusory opinion if it is contradicted by other objective medical evidence in the record. *Johnson v. Astrue*, 628 F.3d 991, 994 (8th Cir. 2011). The ALJ

26

was correct in noting that the checklist provided no explanation or rationale to support Dr. Bohart's opinion.

In records submitted after the ALJ's decision, Dr. Bohart noted that Roland was frustrated because she was denied disability. (Tr. 435). Roland argues that the ALJ failed to properly develop the record concerning Dr. Bohart's treatment notes. The ALJ noted that counsel had the opportunity to supplement the record. (Tr. 27). Records from the CMHC from January 2011 to May 2012 were submitted to the Appeals Council. The claimant's failure to provide medical evidence to support her claim should not be held against the ALJ when there is medical evidence that supports the ALJ's decision. *Steed v. Astrue*, 524 F.3d 872, 874 (8th Cir. 2008). An ALJ is not required to seek additional clarifying medical evidence unless a crucial issue is undeveloped. *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005). The need for medical evidence does not require the Commissioner to produce additional evidence not already within the record. *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995). An ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision. *Id.* The ALJ properly declined to give great weight to Dr. Bohart's opinion and was not required to seek additional evidence.

Roland also argues that the ALJ improperly gave the greatest weight to the medical opinions of the state agency doctors. (Pl.'s Brf at 13). The ALJ stated that the September 2010 report from Dr. Arias did not support Roland's allegations of disability because it did not produce strong clinical signs or findings relating to abnormalities. (Tr.

23). He gave her a GAF rating of 65-70,[6] which showed largely intact overall adaptive functioning and was in the less-restrictive range of overall symptomatology. (Tr. 23). The ALJ noted that Roland's reports to the examiner showed that her mood had improved after she started psychotropic medications. (Tr. 24). The examining psychologist's opinion was given great weight as consistent with the overall evidence. He offered diagnoses of major depressive disorder, single episode, unspecified, and features of PTSD. The ALJ stated that the psychologist reported an optimistic prognosis, provided a solid basis for his opinions, and used vocationally precise and relevant language in his report. (Tr. 24).

The ALJ gave weight to Dr. Arias' opinion because it was supported by the overall record. The more consistent an opinion is with the record as a whole, the more weight will be given to the opinion. 20 C.F.R. § 404.1527(c)(4).

As the ALJ noted, the record did not show that any doctor who treated or examined Roland credibly stated or implied that she was disabled or totally incapacitated, and no doctor placed any credible specific long-term limitations on her abilities to stand, sit, walk, bend, lift, carry, or perform other basic physical or mental work-related activities, at least none that would preclude the performance of work-related activities contemplated within the RFC. (Tr. 26).

---

[6] A GAF of 61-70 denotes: "Some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." American Psychiatric Association; *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision. Washington, D.C., American Psychiatric Association, 2000.

The ALJ gave some weight to the expert opinions of the non-treating and non-examining state agency medical consultants which showed that even though Roland had severe mental impairments, she was still able to sustain the performance of simple tasks in the competitive work environment. (Tr. 28). Roland's basic abilities to think, understand, remember, communicate, concentrate, get along with other people, and handle normal work stress were never significantly impaired on any documented long-term basis, at least not to the extent that she would be prevented from performing the mental work-related activities contemplated within the RFC. (Tr. 28). The ALJ properly accorded weight to the medical sources, and his RFC finding was supported by substantial evidence.

*Assessment of Credibility*

Finally, Roland argues that her credibility was not properly assessed by the ALJ. The ALJ stated that although Roland had functional limitations from severe impairments, her history of seeking treatment, the inconsistency of the presentation of her complaints with the results of diagnostic testing and imaging and clinical findings from examination and courses of treatment, the conservative treatment modalities, and the lack of persistently prescribed pain medication did not support the severity of Roland's allegations. (Tr. 25). The record showed no documented credible serious deterioration in Roland's personal hygiene or habits, daily activities or interests, effective intelligence, reality contact, thought processes, memory, speech, mood and affect, attention span, insight, judgment, or behavior patterns over any extended period of time, such that would prevent the performance of basic work-related activities contemplated within the RFC. (Tr. 29).

29

The ALJ found that Roland's family did not consider her condition to be severe because she cared for her granddaughter. (Tr. 24). And Roland's living situation with her son, daughter, son-in-law, and grandchildren showed that she was able to effectively socialize with her family. She also volunteered once a week at a charitable kitchen. Roland reported no problems with her activities of daily living. (Tr. 24). The ALJ noted that the mental status examination was unremarkable and that Roland reported having close friends, which showed her ability to effectively socialize with others and to have essentially intact social functioning. (Tr. 24).

The ALJ noted that the evidence did not show a strong connection between the alleged onset date and any particular significant medical event, injury, medical change, or medical worsening of any condition that did not favorably and adequately respond to medical intervention. (Tr. 21). The ALJ noted that Roland received conservative care for her psychotic and paranoid symptoms (Tr. 22). The ALJ also found that there had not been a significant change in Roland's mental health care since June 2010. (Tr. 25). She was still seeing Dr. Bohart and received conservative care with medication management and some counseling. (Tr. 25). Roland's daily activities were restricted by her choice or preference and not by any apparent medical proscription. (Tr. 26). There was no credible documented evidence of nonexertional pain or cognitive abnormality seriously interfering with or diminishing Roland's ability to concentrate, at least not to an extent that would preclude the performance of work-related activities contemplated within the RFC. (Tr. 26).

The ALJ is in the best position to determine the credibility of the testimony and is granted deference in that regard. *Johnson v. Apfel*, 240 F.3d 1145 (8th Cir. 2001). An

30

ALJ is entitled to make a factual determination that a claimant's subjective complaints are not credible in light of objective medical evidence to the contrary. *Ramirez v. Barnhart*, 292 F.3d 576 (8th Cir. 2002). This Court cannot substitute its opinion for that of the ALJ. The Court finds no error in the ALJ's determination of Roland's credibility when taken into consideration with the medical evidence in the record.

The ALJ thoroughly considered all exhibits and evidence and found that Roland has not been disabled from the alleged onset to the date of the decision. The Court finds no error in the ALJ's decision.

## V.   CONCLUSION

For the reasons discussed, the Court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and should be affirmed. Accordingly,

IT IS ORDERED:

1.      The Commissioner's decision is affirmed;

2.      The appeal is denied; and

3.      Judgment in favor of the defendant will be entered in a separate document.


Dated this 8th day of May, 2014.

                                    BY THE COURT:

                                    s/Laurie Smith Camp
                                    Chief United States District Judge

31